# EXHIBIT I



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Administrative Appeals Office*
5900 Capital Gateway Drive, Mail Stop 2090
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

MARTA LIDIA PORTILLO CASERES
C/O LAW OFFICES OF RACHEL L RADO
175 PORTLAND ST FL 2
BOSTON MA  02114

DATE: SEPTEMBER 8, 2025        FILE #:  A246518899
                               I-290B RECEIPT #:  LIN2505951498

IN RE:        MARTA LIDIA PORTILLO CASERES

ON BEHALF OF APPLICANT:

RACHEL LEAH RADO, ESQUIRE
LAW OFFICES OF RACHEL L RADO
175 PORTLAND ST FL 2
BOSTON MA  02114

Enclosed is the non-precedent decision of the Administrative Appeals Office (AAO) for your case.  If you believe we incorrectly decided your case, you may file a motion requesting us to reconsider our decision, reopen the proceeding, or both.  The requirements for motions are located at 8 C.F.R. § 103.5.  Motions must be filed on a Form I-290B, Notice of Appeal or Motion, **within 33 days of the date of this decision**.  This time period includes three days added for service by mail.

The Form I-290B website (www.uscis.gov/i-290b) contains the latest information on fee, filing location, and other requirements.  **Please do not mail any motions directly to the AAO.**

If you have any further questions about your case, please call the USCIS Contact Center at (800) 375-5283.

Sincerely,

Susan Dibbins
Chief, Administrative Appeals Office

REV 6/2025                                                                   www.uscis.gov



**U.S. Citizenship and Immigration Services**

**Non-Precedent Decision of the Administrative Appeals Office**

In Re: 38844513

Date: SEPTEMBER 8, 2025

Appeal of Service Center Operations (SCOPS) Decision

Form I-914, Application for T Nonimmigrant Status

The Applicant seeks T-1 nonimmigrant classification as a victim of human trafficking under sections 101(a)(15)(T) and 214(o) of the Immigration and Nationality Act (the Act), 8 U.S.C. §§ 1101(a)(15)(T) and 1184(o).

Service Center Operations (SCOPS) denied the application, concluding that the record did not establish that the Applicant was a victim of a severe form of trafficking in persons, was physically present in the United States on account of such trafficking, and had complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking. The matter is now before us on appeal pursuant to 8 C.F.R. § 103.3.

The Applicant bears the burden of proof to demonstrate eligibility by a preponderance of the evidence. *Matter of Chawathe*, 25 I&N Dec. 369, 375-76 (AAO 2010). We review the questions in this matter de novo. *Matter of Christo's, Inc.*, 26 I&N Dec. 537, 537 n.2 (AAO 2015). Upon de novo review, we will dismiss the appeal.

## I. LAW

Section 101(a)(15)(T)(i) of the Act provides that applicants may be classified as a T-1 nonimmigrant if they: are or have been a victim of a severe form of trafficking in persons; are physically present in the United States on account of such trafficking; have complied with any reasonable requests for assistance in the investigation or prosecution of trafficking; and would suffer extreme hardship involving unusual and severe harm upon removal from the United States. *See also* 8 C.F.R. § 214.202 (reiterating the statutory eligibility criteria).

The term "severe form of trafficking in persons" is defined, in pertinent part, as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 8 C.F.R. § 214.201.

## II.  ANALYSIS

A. The Applicant's Trafficking Claim

In her declarations submitted initially and in response to SCOPS' request for evidence (RFE), the Applicant claimed she was subjected to labor trafficking from February 2018 to June 2022 while employed at Market Basket by her boss, O-,[1] and she provided the following account of her experiences. When she applied for the job she told her boss she was undocumented, but she was still hired and began working part-time. The Applicant was always paid on time, but she was not paid for all the time she worked until she complained. She was also paid her regular rate when she worked overtime and on holidays. When she worked part-time she was denied vacations and did not receive a holiday bonus, but received both after she worked for a year under a contract as a full-time employee. The Applicant began working full-time two years after she started and was told she would receive benefits once she began working full-time, but she did not receive those benefits until she told O- she was going to quit because he was taking advantage of her and not giving her the benefits. The Applicant states that about 20 days later, he gave her the benefits.

When the Applicant took a day off to go to the doctor, O- would take away her hours or make her work extra hours, give her heavier work upon her return, and did not pay her sick leave. O- often yelled at the Applicant and looked at her with an "intimidating" expression. One day, O- told her to hand him a paper and said "Wow, you smell so good, I love it," which made her feel very uncomfortable. When she asked to go to the bathroom, O- told her in an aggressive tone that she could not go until her break time. When the Applicant complained about the mistreatment or refused to work overtime, O- threatened to fire her, would cut her hours, get angry, yell at her and call her stupid. He would also laugh at her when she could not say certain words in English.

When the Applicant cut her hand at work, her manager told her she could not tell anyone that she injured her hand at work and should say it happened at home. When she protested, he told her "That's what you say or else." O- told her she would be fired if she said anything about cutting her hand while working. When she was made to go back and forth between a cold area and a warm area, she got tuberculosis, but did not take time off work because she would not be paid. In February 2021, the Applicant injured her shoulder when lifting heavy objects. When she told O- that she was injured and needed to go to the hospital, he told her she had to stay or she would lose her job. The next day the Applicant went to the emergency room and the hospital gave her a letter stating she could not return to work for at least two months. O- told her she could take 15 days of unpaid leave, after which she went back to work because she had no money. The Applicant had trouble working and on at least two occasions, O- told her "If you don't do what I tell you, I'll call ICE to get you deported. You don't have any rights because you're an illegal." After one such incident, the Applicant fainted because of the stress. Her doctor then wrote her another letter stating she could not lift more than 15 pounds, but when she gave the letter to O- he told her she was fired. The Applicant then hired a lawyer and won worker's compensation.

In her declaration submitted in response to the RFE, the Applicant provides a different account of how she left her job. The Applicant recounts that after she gave her doctor's letters to O- he threw them in

---

[1] We use an initial to protect the privacy of the referenced individual.

2

the trash, called her later and threatened to reduce her to part-time if she did not return to work. The Applicant returned to work because she did not want to lose her benefits, but she was assigned the same work and eventually could not continue. The Applicant explains she was afraid of leaving because O- had told her before that she if she ever quit and asked for a reference, he would give her a bad reference and that she would never find work because Market Basket was the only employer "who hire[s] illegals." The Applicant recounts she worked at Market Basket for a year after hurting her shoulder, but eventually "got fed up with everything and quit." The Applicant was afraid O- would retaliate against her when she quit and she would not be able to find work, but the Applicant does not indicate that she had any contact with O- after she quit.

On appeal, the Applicant submits a third declaration in which she recounts that in March 2023 she was admitted to a psychiatric unit at a hospital because she was very depressed and suicidal. The Applicant explains her shoulder pain was intense and reliving her trafficking experiences to complete her application worsened her depression. The Applicant reports she began seeing a psychologist and psychiatrist and believes the treatment is working, and she filed two workers' compensation cases which she won.

On appeal, the Applicant submits her medical records which corroborate her account of her shoulder injury and psychiatric hospitalization. She also submits documents from the Massachusetts Department of Industrial Accidents which state she was initially injured in February 2021 and was out of work for approximately three months before returning to work until May 2022 when she suffered increased pain and was recommended for surgery. The documents show the Applicant's employer's insurer was ordered to pay her compensation and pay for her shoulder surgery.

B. The Applicant Is Not the Victim of a Severe Form of Trafficking in Persons

SCOPS determined the evidence was insufficient to establish the Applicant was a victim of a severe form of trafficking in persons, in part, because the Applicant did not submit her medical records and documentation of her worker's compensation claims. On appeal, the Applicant asserts SCOPS erred in requiring corroborating evidence and regardless, she has submitted the relevant documentation on appeal. The Applicant claims that O- recruited, obtained, and harbored her through coercion and fraud to subject her to involuntary servitude. The record does not support the Applicant's claim as the evidence does not establish that O- recruited, obtained, or harbored the Applicant for the purpose of subjecting her to involuntary servitude because she was never placed in a condition of servitude.

The term "involuntary servitude:"

> (1) Means a condition of servitude induced by means of any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or a condition of servitude induced by the abuse or threatened abuse of legal process; and
> (2) Includes a condition of servitude in which the victim is forced to work for the trafficker by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through the law or the legal process. This definition encompasses

3

> those cases in which the trafficker holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion.

8 C.F.R. § 214.201. Servitude is not defined in the Act or the regulation but is commonly understood as "the condition of being a servant or slave," or a prisoner sentenced to forced labor, *Black's Law Dictionary* (B.A. Garner, ed.) (12th ed. 2024), or "the state of being under the control of someone else and of having no freedom; the condition of a slave." *Cambridge Dictionary* (Cambridge University Press 2025).

The record does not establish that O- ever placed or intended to place the Applicant in a condition of servitude. Although the Applicant was initially not compensated for all of the time she worked when she was employed part-time, she states she received full payment after she complained. The Applicant further indicates that she was paid and received benefits when she was working full-time. Although the Applicant was initially not paid when she was unable to work due to her shoulder injury, she eventually received workers' compensation.

Apart from her benefits and compensation, the record also indicates the Applicant was not forced to work against her will. Although O- threatened the Applicant with deportation, reducing her to part-time employment, and providing her with a bad reference, the Applicant explains she continued to work because she wanted the benefits and needed to support her daughter. In her declaration submitted in response to the RFE, the Applicant also recounts how she eventually quit her job.

We do not discount the mistreatment the Applicant suffered while working at Market Basket. However, although O- mistreated the Applicant, the record does not establish that he ever intended to place or actually placed her in a condition of servitude. The Applicant was paid, received benefits, and eventually quit her job and received workers' compensation. The Applicant credibly recounted how she was paid for all of her working time after she complained and how she eventually received benefits after she became a full-time employee. The record thus does not establish that O- subjected her to a condition of servitude. As the Applicant was never subjected to a condition of servitude, she has not established that O- recruited, obtained, or harbored her for the purpose of subjecting her to involuntary servitude. The Applicant does not claim that that O- intended to subject her to peonage, debt bondage, or slavery. Accordingly, the Applicant has not demonstrated that she is a victim of a severe form of trafficking in persons.

C. Physical Presence and Compliance

As the Applicant has not established that she is a victim of a severe form of trafficking in persons and this issue is dispositive of her appeal, we do not reach and hereby reserve determination of whether she is physically present in the United States on account of the trafficking and whether she complied with any reasonable request for assistance in the investigation or prosecution of trafficking. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (stating that agencies are not required to make "purely advisory findings" on issues that are unnecessary to the ultimate decision).

## III. CONCLUSION

The Applicant has not established that she is a victim of a severe form of trafficking in persons. Accordingly, she is ineligible for nonimmigrant classification under section 101(a)(15)(T) of the Act.

**ORDER:**   The appeal is dismissed.

**NOTICE:** This constitutes the final decision in this matter. The filing of a motion will not postpone the effect of the decision. 8 C.F.R. § 103.5(a)(1)(iv). Aliens who are not lawfully present, or who are otherwise inadmissible or deportable, may be subject to the commencement of removal proceedings under section 240 of the Act through the issuance of a Form I-862, Notice to Appear. Those proceedings may result in their removal from the United States and possible ineligibility for future visas or other immigration benefits.